United States v. Torrance Bunch
Evidentiary Hearing
Summary of Testimony
December 17, 2015

**1.  Torrance Bunch:**

The Defendant testified that at the time of his arrest on state charges (Exhibit 1 &2) he contacted Ron Fields[3] to represent Amanda Hall and himself (R. 8:45) and that Rex Chronister entered his appearance for both in the criminal case and the civil forfeiture matter (Ex. 3,4, &7) (R. 9:22).  Rex never discussed any potential conflict of interest concern. (R. 12:36) nor did Mr. Fields. (R. 12:56). At the time they entered their appearance I just paid them and there was no discussion about any conflict. (R. 13:18). Ultimately, on January 13, 2010, Rex Chronister appeared with both at the time of their pleas on the state court charges (Ex. 5 &6) and no conflict of interest had been discussed (R. 17:20).  At the time the Agreed Order and Amended Agreed Order (Exhibit 7 & 8) on the property forfeiture was entered there was no discussion of a conflict. (R. 19:00 and R. 21:01).

The Federal Indictment was filed in May 2010. (Exhibit 9).  A search warrant (Ex. 10)

---

[3]Ron Fields did not make any court appearances in the state case. (R. 10:30).

was applied for April 20, 2010 and I was unaware of the search warrant (R. 24:10). Paragraph five discusses the arrest that led to the state court charges. (R. 25:00). My attorney did not discuss the search warrant with me. (R. 25:30). When I found out I had a federal indictment I contacted Ron Fields for representation. (R. 26:40). I agreed to $25,000 for my representation and $15,000 for Amanda Hall's representation. (R. 27:14)  Neither Mr. Fields or Mr. Chronister advised me there was a conflict or potential conflict. (R. 27:27). I believed I was represented by the law firm of Chronister, Fields, & Flake.

    The receipts (Ex. 11) represent money I paid to the law firm to represent me and Amanda Hall. The receipts do not add up to $25,000 but they do acknowledge they received $25,000 to represent me. (Ex. 11, p. 5) (R. 30:15). Amanda Hall was arraigned on June 11, 2010 and Barry Neal entered his appearance. (Ex. 12). I had paid $3,000 toward Amanda Halls fee (Ex. 11, p. 3) and I cannot explain why Chronister, Fileds & Flake did not enter their appearance. No one discussed it with me or that there was a conflict. (R. 31:42). [4]

    Ms. Hall was arraigned on June 11 and unknown to me on July 7, 2010 she met with investigator Paul Hersey, AUSA, and Barry Neal her appointed counsel. She discussed her involvement with me concerning the conspiracy charge. (R. 38:34).

    I was arraigned on the indictment July 9, 2010 (Ex. 14). I was arrested in Texas on June 16th and had a Rule 9 hearing in Texas. (R. 39:50). Mr. Chronister was my attorney when I was arraigned. Mr. Chronister did not discuss any conflict of interest and did not indicate any problems about Amanda Hall (R. 40:20). I knew he was not representing Amanda Hall because

---

[4] At this point in the record the government objected to Exhibit 13 and a discussion was conducted with the court and a stipulation reached between the Government and the Defendant (R. 32:00 to R:37:02).

-21-

he said the government objected to him representing her and he choose to represent me. (R. 40:34).  During my transport from Texas I thought the firm was representing both of us. (R. 40:59).  In the holding cell he told me that he only represented me because the government objected, but he did not say why they objected (R. 41:20 to 41:31). He never used the word "conflict" (R. 41:36) I did not know the reason that the government objected and I did not enquire into it. (R. 41:53).

      Mr. Fields and Mr. Chronister did not visit me more time than reflected in the jail log (Ex. 15) but we did communicate by phone. (R. 44:53). Conflict of Interest was never discussed. (R. 45). At the September 22, 2010 the issue over the DEA Form 6 (Ex. 13) arose. I did not speak to them about Amanda Hall. (R. 48:01) but I knew Ms. Hall had the meeting (July 7, 2010 with DEA) but they never discussed it with me. (R. 48:25). They did not tell me there was a conflict then. (R. 48:59).

      I wrote my attorney on August 5, 2010 (Ex. 17) to ask for a change of venue because I had no intention of taking a plea. (R. 53:40).  As of September 4, 2010 (Ex. 19) no one had discussed a conflict of interest be me and Ms. Hall. (R. 57:26).

      Ms. Hall entered a changed of plea on October 6, 2010. (Ex. 22).  I did not know she was going to enter a change of plea. (R. 1:02:15).

       Before September 29, 2010 Mr. Chronister spoke with me about a mandatory life sentence.  (R. 1:07:12).

      Mr. Chronister came to see me on October 8, 2010 and went over the contents of his October 8, 2010 letter (Ex. 31)(R1:17:05).  He asked me to sign the letter but I would not, but I remember the discussion about the letter. (R. 1:17:25).  Until he came to see me I was not aware

there was a conflict between me and Amanda and Mr. Chronister's office. (R. 1:18:06). October 8, 2010 is the first time anyone talks to me about a conflict of interest. (R. 1:21:05). He just said there was a conflict and he would not be able to represent me. (R. 1:21:18). He did say that as long as I plea there is no problem. (R. 1:21:32). I never allowed Mr. Chronister to withdraw. (R. 1:29:28). Since June 2010 neither Mr. Fields or Mr. Chronister ever told me that if a conflict arose they would not be allowed to represent me. (R. 1:30:28). I would have never retained them if I had know they would be allowed to get out of my case without repaying the money. (R. 1:30:55).

Mr. Chronister came to see me on October 8, 2010 and went over the contents of his October 8, 2010 letter (Ex. 31)(R1:17:05). He asked me to sign the letter but I would not, but I remember the discussion about the letter. (R. 1:17:25). Until he came to see me I was not aware there was a conflict between me and Amanda and Mr. Chronister's office. (R. 1:18:06). October 8, 2010 is the first time anyone talks to me about a conflict of interest. (R. 1:21:05). He just said there was a conflict and he would not be able to represent me. (R. 1:21:18). He did say that as long as I plea there is no problem. (R. 1:21:32). I never allowed Mr. Chronister to withdraw. (R. 1:29:28). Since June 2010 neither Mr. Fields or Mr. Chronister ever told me that if a conflict arose they would not be allowed to represent me. (R. 1:30:28). I would have never retained them if I had know they would be allowed to get out of my case without repaying the money. (R. 1:30:55).

I hired Mr. Harrelson after my trial and he filed a motion for a New Trial (Ex. 35) (R. 1:33:33). I discussed with Mr. Harrelson the problems I had with Mr. Chronister. (R. 1:34:04). Mr. Harrelson also filed objections to the presentence investigation. (R. 1:36:56). I spoke with

Mr. Harrelson about filing an appeal and he filed a brief that raised on one issue dealing with voluntary waiver of counsel. (Ex. 42). Mr. Harrelson also filed a Petition for Rehearing. (Ex. 43).

I had discussions with Mr. Harrelson about what I wanted to appeal and conflict free counsel was my issue. (R. 1:46:28). We talked about it and he said he would need time to look over all the trial papers and that he would file the brief. (R. 1:46:51). I told him specifically about the conflict free issue. (R. 1:47:12). He acknowledged that it was an issue. (1:47:19). Mr. Harrelson never explained why he did not raise the issue. (R. 1:48:35).

Cross Examination (R. 1:50)

I was convicted in Oklahoma of Possession of a Controlled Substance with Intent to Deliver in 2006 and also in 2006 I was convicted of Delivery of a Controlled Substance in Sebastian County. (R. 1:50:28). In 2009 I was convicted of Conspiracy to Possess Methamphetamine with Intent to Deliver and Mr. Chronister represented me. (R. 1:51:01). I understood on October 13, when Judge Dawson explained there was a conflict, that Mr. Chronister was no longer allowed to represent me. I made efforts to obtain another attorney, I spoke with Erwin Davis. (R. 1:53:20). The court did appoint Shannon Blatt and she came to see me on November 2 but I refused to speak with her. (R. 1:53:30). On October 13, 2010 I was present at the hearing and heard the AUSA and Mr. Chronister address the court but I did not understand what a conflict was. (R. 1:55:34). Exhibit 18 is a letter I wrote to my attorney and it contained legal research I had done on change of venue. (R. 1:56:11). Exhibit 19 referenced legal research I had done on my case on severance of defendant and wire tapping. (R. 1:57:23). I also cited Rule 17 of the Arkansas Rules of Criminal Procedure. (R. 1:57:44).

### 2. Barry Neal

Direct Examination:  I represented Amanda Hall and have reviewed my file. (R. 2:03:30). I made the initial appearance on June 11, 2010 and was appointed to Ms. Hall. (R. 2:04:45).  At the time of the initial appearance I was not aware of any conflict between Amanda Hall and Torrance Bunch. (R. 2:05:22).  I remember a meeting between the U.S. Attorney, Special Agent Hersey and Ms. Hall concerning a proffer. R. 2:06:12. The reason for the meeting was to get information from Ms. Hall and part of the information involved Mr. Bunch's involvement. R. 2:06:59.  Mr. Bunch was the primary target. I would not have represented Mr. Bunch after that proffer because it would have been a conflict of interest. R. 2:08:03.  During the proffer meeting it is fair to say that Ms. Hall implicated Mr. Bunch. R. 2:14:26.  Ms. Hall discussed with me briefly her charges and conviction in Arkansas state court and it was my understanding that she was represented by Mr. Chronister. R. 2:17:45.  It was my understanding that the state court conviction included the same time period (as the federal conviction). R. 2:18:01.

Cross Examination (R:2:19:04): I have practiced law for 24 and one half years.  I have represented hundreds of criminal clients.  Amanda Hall entered a plea agreement on October 6. Prior to that date she entered a proffer on July 7, 2010.  An agreement to provide a proffer interview is significantly different than an agreement to testify at a jury trial. R. 2:21:23. Amanda Hall was not bound by her agreement to testify at the jury trial until October 6, 2010. R. 2:21:38. As a result of her agreement to testify on October 6 I became aware of a conflict between Rex Chronister and my client, Amanda Hall. R. 2:21:56. The nature of the conflict was that Mr. Chronister had represented both in state court.  Prior to October 6 there was only a potential

conflict and not an actual conflict because you do not know the conflict exist until it becomes obvious. R. 2:22:34. It may not appear, accrue, or attach until a certain point and it was that October 6 date that it attached when it became obvious that she would be called upon to testify. R. 2:22:55. I had a phone conversation with Mr. Chronister on October 6th about the conflict and I told Mr. Chronister that if Ms. Hall were called upon to testify that she would testify and testify truthfully. There was no question in my mind that it was in Amanda Hall's best interest to work with the government and to not waive any potential conflict. R. 2:24:12. I would have done everything I could have to prevent her from waiving a conflict of interest.

    Re-Direct: I do not necessarily believe that anytime two individuals are arrested together there is a significant conflict. R. 2:29:33. After the proffer meeting on July 7 based upon what I knew Amanda Hall said I would not have represented Mr. Bunch. R. 2:33:40. I am not sure a significant risk of a conflict existed on July 7. If Mr. Bunch was going to trial if Mr. Bunch is going to plea the conflict of interest does not appear. R. 2:34:11. There would be a significant risk if I knew Mr. Bunch was going to insist on going to trial. R. 2:34:54. If I had know he was going to plea there would not be a significant risk of a conflict. R: 2:35:00. If Mr. Bunch had told me he was going to insist on a trial that would have created a significant risk. R. 2:35:13.

    Re-Cross Examination: Ms. Hall was reluctant to testify because she was scared of Mr. Bunch. She had faith in me and that I believed it was in her best interest to testify. The proffer interview was not an agreement to testify against Mr. Bunch. R. 2:36:29. The agreement to testify was entered into before the court on October 6, 2010.

a hooray and we had to take a break and go outside and talk to Torrance. That was six or seven

days before Amanda Hall's change of plea. I do not recall reading the documents that Torrance had. R. 3:51:40. I did not take that document and go through it and try to read it. Ron and I were trying to calm Torrance down because he was pretty upset. I have no recollection of reading the

    **3. Rex Chronister:** R. 2:40:10

    Direct Examination: I am an attorney with the law firm of Chronister, Fields, and Flake. I first represented Torrance Bunch in the Summer or Fall 2009 in a state case. The firm agreed to represent Torrance on his federal charges. Torrance's initial communication was with Mr. Fields but it was my understanding that Torrance had initially contacted us to represent Amanda on the federal case. R. 2:43:39. Ron and I talked and decided that we couldn't do that. Torrance had sent some money for Amanda and that was to be converted to Torrance's fee and we would represent Torrance in this matter. R. 2:44:03. We represented Torrance, Amanda and a third individual in the state case in 2009. When Ron came to me about representing Amanda, Ron and I talked about it, and with Torrance being a defendant in the case we decided we could not represent Amanda. R. 2:44:58.

    The state case was different. In that case Ron had talked to Torrance in the Sebastian County jail then got the case file. It was obvious in that case that the issue was a search issue. R. 2:45:35. That case was not going to trial. There was a defective issue with the warrant. That case was not going to trial so there was no conflict and it did not go to trial. The reason for the great plea deal was, in my opinion, the defective search warrant.

    My first involvement with Torrance was in person on the day of his arraignment. I had a discussion with Mr. Bunch in the detention area of this building I believe right before we came upstairs for his initial appearance. We met downstairs, we talked about the indictment, we talked

about a potential conflict if Amanda Hall were to testify against him. R. 2:49:39. Torrance said that he and Ron had discussed that and he did not need to worry about it because Amanda was his girl and she would not testify against him. R. 2:48:48.

      Later in my representation I met with Torrance and an AUSA at the jail in Benton County and during that meeting I again advised Torrance about a potential conflict. The meeting was in late September. R. 2:49:31. We were there to listen to some tapes. Ron and I were there, an AUSA, some other people were there. We listen to some tapes. We took a break to visit with Torrance to visit on some plea discussions. Prior to that the AUSA and I had talked back and forth that Amanda was more and more coming into play. That she would in fact proffer and testify against Torrance. R. 2:49:57. Torrance's response was continuously that "she would not under any circumstances testify against him" and that it would not happen. R. 2:50:13.

      At some point I received word that Amanda Hall had signed a plea agreement and was going to testify for the government. I went to her change of plea hearing. After her change of plea hearing there was a meeting with Barry Neal, myself, AUSA and Judge Dawson concerning the conflict. The AUSA was of the opinion that the conflict could not be waived. Barry and I had talked, I cannot remember when, about Amanda waiving the conflict. My understanding was that she was not going to do it. R. 2:52:24. When we were in Judge Dawson's chambers, Barry advised Judge Dawson that she was not going to waive the conflict. Judge Dawson wanted me to go talk to Torrance because if he wanted to plea we would not "have to cross that bridge." R. 2:52:50.

      I drew up a letter (Ex. 31)explaining this to Torrance and I went to the jail to see him and go over the letter. The handwritten note in the upper right side of the letter states "Left with

Torrance. Would not sign but will not plea under any circumstances." The AUSA had advised me that he could file a piece of paper and the sentence would be mandatory life and I explained that to Torrance. There was a plea agreement still being offered by the government at this time. Torrance advised me that "I was wrong, Amanda was not going to testify against him. His family had been over to see Amanda and, in fact, if she testified she was going to exonerate him." R. 2:55:41.

Based on my discussion with Mr. Bunch and his statements to me I believe that he adequately understood the conflict issue with Amanda Hall. Torrance would never accept the possibility that Amanda Hall would ever testify against him but he understood we had a problem if Amanda Hall testified. R. 2:59:37.

When Amanda choose to testify that created the appearance of a problem we had to deal with. R. 3:01:13. At that point in time there is a no win situation. Whether it was or was not technically a conflict it was the appearance of one. R. 3:01:49. I did not believe I had a conflict prior to Amanda Hall's agreement to testify (R. 3:02:05) because if she did not testify there is no problem cross examining her. If both plead guilty there was no problem representing Mr. Bunch. R. 3:02:26.

Cross Examination R. 3:03: In the state case I never took a statement from Mr. Bunch or Ms. Hall. Ron Fields spoke with both in the jail and discussed the issue with the search. R. 3:06:33. I did represent Torrance and Amanda in a civil forfeiture and as I recall those items were forfeited to resolve the criminal matter. R. 3:11:02.

I never told him that the government objected to me representing both he and Amanda. I did discuss with him why I could not represent Amanda. When we were downstairs I talked to

him about the indictment I told him there was an issue with Amanda and his response was that he and Ron had discussed it and it was not an issue and Amanda was not going to be testifying. R. 1:15:03. I do not remember seeing a search warrant. I do not remember that three of the cell phones that were forfeited in the state case were covered in the search warrant. R. 3:17:36. The search warrant was a document I could have accessed during my representation of Mr. Bunch. R. 3:20:24. Mr. Bunch did pay us $25,000 to represent him and if the matter went to trial it would be another $10,000. R. 3:22:06. The family brought the other $10,000 around the time that Amanda changed her plea and I tried to find someone to step in for us.

      I realized that there is nowhere in my file is a document that expressed to Mr. Bunch my concern (about Ms. Hall testifying) until after she entered her plea. R. 3:29:50. That did not get done but it would have been prudent to have done so. I did discuss with him several times about a conflict of interest; here before arraignment, in the jail listing to tape, and the last time there.

      I remember the meeting with Mr. Bunch, Ron, the AUSA. I did not remember an incident with Mr. Hersey until you just asked me the question. R. 3:31:43. We had not given Torrance that paperwork, I think he got it from some other people. R. 3:32:13. I do not remember a DEA 6 form. I believe I have seen the document before. I do remember that Amanda Hall had a meeting with her attorney, the AUSA and Mr. Hersey on July 7. I can not remember when I found out about the meeting. If I had known about the meeting between Ms. Hall and the DEA I don't think I would have taken the case. R. 3:42:16. I did have a chance to review the DEA form with Mr. Bunch before Amanda Hall changed her plea. R. 3:43:02. Mr. Bunch never agreed to allow me to withdraw. R. 3:43:31.

      At the time we were retained I never discussed with Mr. Bunch that if we had to

withdraw we would refund his fee. R. 3:45:00. I never negotiated anything about the fee, it was a done deal between Ron and Torrance by the time he was apprehended.

    Re-Direct Examination: Defendant Exhibit number 16 is a letter from the AUSA dated July 26, 2010 which states that enclosed was the discovery materials "Bates stamped numbers 1 through 271." In looking at Defendants Exhibit Number 13 (DFA Form 6) which was proffered but not admitted into evidence is the statement from Amanda Hall and there is no Bates Number reflected on any page of the report. R. 3:47:08. Jenks material is not release in the normal course of discovery but are released immediately before trial. I am also familiar with the office policy of redacting information from the form and no information has been redacted. It is possible that the first time I found out about this document was when Mr. Hersey found out that Mr. Bunch was unlawfully in possession of the document. R. 3:48:57.

    I received an email from the government on October 4, 2010 stating that Ms. Hall would be changing her plea and that the government would be providing a written summary of her expected testimony. R. 3:50:08.

    Re-Cross Examination: R. 3:50:55

    Mr. Bunch had the DEA Form. I remember, when you called my attention to it today, that there was document or recognizing that it was a statement from Amanda. R. 3:52:12. I wish Torrance "would have bothered to tell me he was aware Amanda had given a statement or what that statement was because he never told me that. " R. 3:52:40.

    **4. Jeff Harrelson:** R. 3:59:01

    I opened my file on Mr. Bunch in January 2011. I was hired by Mr. Bunch or his family. I represented Mr. Bunch during the sentencing phase. I filed a Motion to Extend Time to File

Objections and a Motion for a New Trial and those motions were taken up at the Sentencing Hearing. R. 4:01:23.  After the sentencing hearing I filed a Notice of Appeal on his behalf and represented him on appeal.

We spoke on the telephone during the time I was working on his appeal. We discussed the possible issues. The issue that I thought was the strongest was the way the district court had handled his waiver of counsel. R. 4:02:53.  The issue of "choice of counsel argument", having done the research at the time, and having looked at the transcript, I did not feel like that was that strong of an issue. R. 4:03:12.  After I had an opportunity to review the standard of review on appeal for each of those issues I felt like the better argument to go with was right to counsel but I did consider the choice of counsel argument. R. 4:03:26.  There is a page limit on appeal but I have been taught to go with your strongest argument because you water down you good argument if you put in some other that are not going to get you any relief.  R. 4:04:07. It is my job as an appeal attorney to winnow down the issues to the strongest possible issues to present to the court and you try to focus on the issues that are meritorious.  Whenever you lose an appeal you always wonder if you should have put other issues in but every time I write on I go with the issues I consider the strongest. Having done the research I would say that I made a strategic decision to not include the choice of counsel argument. I thought that the way that the other circuits had worded their opinions plus the way the eighth circuit led me to believe they would rule I thought we had a winner. R. 4:06:43.

I wrote Mr. Bunch a letter (Government Exhibit 1) which does discuss the fact that I choose not to appeal a certain issue.  The second paragraph states:

> As you will notice after our conversation about whether to include
> sufficiency of the evidence as a ground on appeal, I choose not to,
> as it was not a strong argument and one of the unwritten rules about
> appeals that I believe in is not watering down your good arguments
> with weak ones.

I cannot remember the conversation we had but this (letter) lets me know that we did have conversations about the issues we would or would not include in the appeal. I do not specifically remember the other issue. R. 4:09:54.

Cross Examination: R. 4:10:00.  I authored the Motion for New Trial and before I filed that document I had spoken with Mr. Bunch.  I raised the conflict free counsel issue in the motion. R. 4:13:47.  I did file an objection to Pre Sentence Report (Ex. 36) and I raised the conflict fee counsel.

I did file an appeal brief and Exhibit 42 is a copy of a potion of that brief. R. 4:19:35. The issue that was raised was the right to counsel and the procedure that the district court used to make him try the case by himself was not proper under eighth circuit law. R. 4:20:07.  The conflict free counsel argument was not raised in the brief. I did file a Petition for Rehearing En Banc and included the paragraph about conflict free counsel. I really though we were going to be successful in the panel and this is me saying to the entire court that I don't think you guys listened. I don't think they could rehear the issue of conflict free counsel because it was not preserved for review in the brief. R. 4:23:21.  I don't know that it was a thought process at the Petition for Rehearing that I was saying "Oh yea, I forgot about that", it was more of let me go back and see what else I could do to get their attention.  R. 4:25:17.

Re-Direct Examination: R. 4:25:35.  The choice of counsel was an abuse of discretion

standard and you just don't win those. The one that I choose to go with (waiver of counsel) is a de novo standard. R. 4:26:29.

Re-Cross Examination: R. 4:29:00. I am not sure an individual is entitled to conflict free counsel at the time of arraignment. Honestly, for an arraignment, that is a step in the process but I am not sure it is that big of a deal just for somebody to waive arraignment, plea not guilty, and get some dates. R. 4:33:35.

I was aware that Mr. Chronister had represented Mr. Bunch and Ms. Hall in a state case in 2009. R. 4:37:37. The conspiracy count of the federal indictment included the time frame of the state court case. The court ruled that Mr. Chronister could not represent Mr. Bunch since Amanda Hall was testifying. If she was going to testify there was a real conflict. R. 4:39:02. What I mean by becoming real was the risk became greater when there was not able to a negotiated settlement. R. 4:39:45.

Court Examination: R. 4:41:28. After everything that I have heard, read, and answered today it is still my opinion that as between the waiver argument and the conflict argument the waiver argument was absolutely the better argument and it was a strategic choice.